ELMORE, Judge.
Respondent-mother ("Mrs. A")[1] appeals from a permanency planning order in which the trial court granted guardianship of one of her four children, V.P.M.A. ("Lydia"), to non-relative caretakers ("Mr. and Mrs. S"), while maintaining Mrs. A's rights of visitation and financial support for the child. After careful consideration, we affirm.
I. Background
Between July and November 2014, Mrs. A and respondent-father ("Mr. A")[2] adopted Lydia and her three biological siblings from Ukraine. At that time, the children ranged in age from four-year-old Lydia to sixteen-year-old Virginia, and none spoke English.
Mr. and Mrs. A separated from each other while the adoption was being finalized. Mr. A then flew from Ukraine to his home country of France to seek substance abuse treatment, while Mrs. A and the four children arrived at Mrs. A's two-bedroom condo in Wake County on Saturday, 8 November 2014.
On Monday, 10 November 2014, Mrs. A left the children with a babysitter and returned to work. According to Mrs. A, she "almost immediately had what she called a 'nervous breakdown' " due to "her marital separation, her financial issues, her trouble at work, and the children's language and emotional issues."
At the suggestion of the babysitter and others, Mrs. A voluntarily placed Lydia and Virginia with Mr. and Mrs. S on 20 November 2014-twelve days after the children had arrived in the United States. Mrs. A did not personally know Mr. and Mrs. S, and she later reported having no alternative placement options for the children. The two middle siblings, Amy and Jeb, remained in Mrs. A's home.
On 6 February 2015, Wake County Human Services (WCHS) filed a petition alleging that Lydia and Virginia[3] were dependent juveniles. Based on a December 2014 report and follow-up investigation by the agency, WCHS specifically alleged that Mr. and Mrs. A had "traveled to Ukraine to adopt two children. They were informed by the Ukrainian agency that they would have to adopt all four children of a sibling group if they wanted the two they intended to adopt." The petition went on to explain that Mr. A "remains in France. His plans to stay in France or return to the United States are unknown to WCHS. Almost immediately upon returning to North Carolina with the children, [Mrs. A] realized that she was not equipped to parent four children alone." WCHS obtained nonsecure custody of Lydia and Virginia.
Following a 10 March 2015 adjudication and disposition hearing, the trial court entered a consent order-signed by Mrs. A and her attorney-adjudicating Lydia and Virginia to be dependent juveniles and providing that WCHS "shall continue to make reasonable efforts to eliminate the need for placement of the children outside of the home." The court ordered that Mrs. A enter into a case plan with WCHS, which required her to comply with mental health treatment, participate in a psychological evaluation, maintain stable and sufficient housing and income, complete parenting education and demonstrate skills learned, and comply with her visitation agreement. Pursuant to that agreement, Mrs. A was to have supervised visitation with Lydia and Virginia for a minimum of one hour every other week.
The trial court held placement review and initial permanency planning hearings in June 2015. In an order dated 13 July 2015 ("cease reunification order"), the court first noted that the matter had been "continued in progress on June 3, 2015 until June 18, 2015. In the interim, [Mrs. A] voluntarily executed a relinquishment of her parental rights over [Lydia] to [WCHS]." The court went on to explicitly find that "[Mrs. A] has voluntarily relinquished her parental rights to [Lydia]. While she is willing to relinquish her rights to [Virginia], as well, WCHS will not accept a relinquishment for [Virginia] as adoption is not an appropriate plan for her." The court concluded as a matter of law that "[r]eunification efforts would be inconsistent with the children's safety and need for a safe home within a reasonable time," ordered that "[r]eunification efforts shall cease," and made adoption the permanent plan for Lydia. A review hearing was scheduled for 8 December 2015 but did not in fact take place until 12 April 2016.
On 2 March 2016, Mrs. A filed a motion to set aside the relinquishment and noticed the motion for an 8 March 2016 hearing. In her motion, Mrs. A requested the trial court find (1) that when Mrs. A relinquished her rights to Lydia in June 2015, she had intended to sign a specific relinquishment to Mr. and Mrs. S rather than a general relinquishment to WCHS; (2) that WCHS was on notice that Mr. and Mrs. S could not "re-adopt" Lydia without approval from the Ministry of Social Policy of Ukraine; and (3) that Mrs. A, therefore, "should be allowed to revoke the fraudulent relinquishment and proceed with reunification" with Lydia. The 8 March 2016 hearing on Mrs. A's motion was continued to 12 April 2016.
Mrs. A completed an online parenting class in May 2016. On 22 July 2016, Mrs. A filed a motion for review in which she alleged that "[in] a hearing on April 12, 2016, the court ordered the primary plan to be adoption and the secondary plan to be guardianship. As of the filing of this motion, there is no filed Order from that hearing." Mrs. A further claimed that she had fully complied with the terms of her case plan; that her visits with Lydia had been consistent, safe, and appropriate; and that, upon reaching the age of majority that same month, Virginia had chosen to live with Amy, Jeb, and Mrs. A. Mrs. A thus requested that the primary plan for Lydia "be changed to reunification" and that she be granted "unsupervised overnight visits" with the child, which had not taken place since November 2014.
An order from the 12 April 2016 hearing was eventually filed on 26 August 2016 ("concurrent planning order"). In the concurrent planning order, the trial court first noted that the matter had been continued on 8 December 2015 and 8 March 2016 "as the parties needed to gather more information regarding [Mrs. A's] relinquishments, and the child's adoptability due to possible international complications." The court then went on to find as follows:
4. The primary plan of adoption remains the best primary plan to timely achieve permanence for the child.
5. The adoption of a secondary plan of guardianship is the best secondary permanent plan to timely achieve permanence for the child.
6. Reunification efforts with the parents were previously ceased.
7. [Mrs. A] voluntarily signed relinquishments on June 11, 2015. Due to [Mrs. A's] desire to revoke the relinquishments, and procedural defects in accepting the relinquishments, WCHS is not seeking to proceed with the relinquishments. The agency is allowing [Mrs. A] to revoke the relinquishments at this time.
Despite Mrs. A's revocation of the relinquishment as to Lydia, the court concluded as a matter of law that "reunification is not in the best interests of the child" and ordered WCHS to "complete whatever steps are necessary to finalize the permanent placement of the child" in accordance with her primary or secondary plan.
The trial court held additional review hearings on 17 November 2016, 9 February 2017, and 3 April 2017, during which it received testimony from Mrs. A's and Lydia's therapist, Mrs. A herself, the social worker, Mr. and Mrs. S, and the guardian ad litem (GAL). In an order dated 30 August 2017 ("guardianship order"), the court made forty-five findings of fact to support its conclusions that the best primary plan for Lydia was guardianship with Mr. and Mrs. S and that it was in her best interest to waive all future review hearings. The guardianship order granted all decision-making authority to Mr. and Mrs. S and provided that Lydia's "[v]isitation with [Mrs. A] and the siblings shall occur a minimum of four hours per month, to be monitored by either [Mr. or Mrs. S] or their designee." Mrs. A entered timely notice of appeal.
II. Assignments of Error
On appeal, Mrs. A first contends the trial court acted contrary to several statutory mandates by failing in the guardianship order to make certain findings of fact related to reunification. Next, she argues the court's findings as to Mrs. A acting inconsistently with her constitutionally-protected parental status as well as the health and safety of the child are not supported by the evidence. Lastly, Mrs. A contends the court did not apply the proper evidentiary standard in making its best interest determination, which she further argues is not supported by adequate findings.
III. Standard of Review
"This Court's review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and whether the findings support the conclusions of law." In re P.O. , 207 N.C. App. 35, 41, 698 S.E.2d 525, 530 (2010) (citation omitted). "The trial court's findings of fact are conclusive on appeal when supported by any competent evidence, even if the evidence could sustain contrary findings." In re J.H. , 244 N.C. App. 255, 268, 780 S.E.2d 228, 238 (2015) (citation and quotation marks omitted). "The trial court's conclusions of law are reviewable de novo on appeal." In re D.H. , 177 N.C. App. 700, 703, 629 S.E.2d 920, 922 (2006) (citation and quotation marks omitted).
"In choosing an appropriate permanent plan ... the juvenile's best interests are paramount." In re J.H. , 244 N.C. App. at 269, 780 S.E.2d at 238. "We review a trial court's determination as to the best interest of the child for an abuse of discretion." In re D.S.A. , 181 N.C. App. 715, 720, 641 S.E.2d 18, 22 (2007).
IV. Reunification
Mrs. A first contends the trial court violated N.C. Gen. Stat. §§ 7B-906.2(b), 7B-906.1(d)(3), and 7B-906.1(e)(1) by failing in the guardianship order to make required findings of fact as to reunification. She asserts that the court improperly "abandoned any concern with reunification, and instead focused exclusively on what it concluded were in the child's best interests." According to Mrs. A, "reunification should have become a permanent plan again" when WCHS allowed Mrs. A to revoke her relinquishment of Lydia.
A. N.C. Gen. Stat. § 7B-906.2
Prior to October 2015, a trial court could order a department of social services to cease reunification efforts if it found "[s]uch efforts clearly would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." N.C. Gen. Stat. § 7B-507(b)(1) (2013). Effective 1 October 2015, N.C. Gen. Stat. § 7B-906.2 ("concurrent planning statute") directs the court to adopt "one or more ... permanent plans the court finds is in the juvenile's best interest," including reunification, adoption, and guardianship. N.C. Gen. Stat. § 7B-906.2 (2015). Subsection (b) of the concurrent planning statute specifically provides as follows:
At any permanency planning hearing, the court shall adopt concurrent permanent plans and shall identify the primary plan and secondary plan. Reunification shall remain a primary or secondary plan unless the court ... makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety.
N.C. Gen. Stat. § 7B-906.2(b).
Mrs. A contends that because the guardianship order does not include a finding that reunification efforts would be clearly unsuccessful or inconsistent with Lydia's health or safety, the order must be vacated.
B. N.C. Gen. Stat. § 7B-906.1
N.C. Gen. Stat. § 7B-906.1 requires that a trial court conduct a permanency planning hearing in every case in which a child has been removed from the custody of a parent. N.C. Gen. Stat. § 7B-906.1 (2015). As a general rule, additional hearings should be held at least every six months thereafter "to review the progress made in finalizing the permanent plan for the juvenile, or if necessary, to make a new permanent plan for the juvenile." N.C. Gen. Stat. § 7B-906.1(a).
Pursuant to N.C. Gen. Stat. § 7B-906.1(d), the trial court must consider certain criteria at every review hearing and make written findings regarding those that are relevant. Subsection (d)(3) sets forth one such criteria as follows:
Whether efforts to reunite the juvenile with either parent clearly would be unsuccessful or inconsistent with the juvenile's health or safety and need for a safe, permanent home within a reasonable period of time. .... If the court determines efforts would be unsuccessful or inconsistent, the court shall consider other permanent plans of care for the juvenile pursuant to G.S. 7B-906.2.
N.C. Gen. Stat. § 7B-906.1(d)(3).
Mrs. A contends that her successful parenting of Lydia's two middle siblings, her consistent visitation with Lydia, and her strict compliance with her case plan all support a finding that reunification efforts would have been fruitful. She asserts that "[t]he court had an obligation to address that possibility pursuant to N.C. Gen. Stat. § 7B-906.1(d)(3). It did not, so the guardianship order was entered in error."
Similar to N.C. Gen. Stat. § 7B-906.1(d), N.C. Gen. Stat. § 7B-906.1(e) provides that
[a]t any permanency planning hearing where the juvenile is not placed with a parent, the court shall additionally consider the following criteria and make written findings regarding those that are relevant:
(1) Whether it is possible for the juvenile to be placed with a parent within the next six months and, if not, why such placement is not in the juvenile's best interests.
Mrs. A likewise contends N.C. Gen. Stat. § 7B-906.1(e)(1) applies here because the "evidence of [her] care of Lydia's siblings, along with her strict compliance with her case plan, made relevant the question of whether Lydia could return home within the next six months." Mrs. A claims that Lydia's therapist "was advocating for such a transition to [Mrs. A's] home within the next three months" and that "[w]hen the court failed to make a written finding about whether the therapist's contention was correct, it violated N.C. Gen. Stat. § 7B-906.1(e)(1)."
C. Compliance with N.C. Gen. Stat. §§ 7B-906.2 and 7B-906.1
Mrs. A concludes that because the trial court "did not resolve these key issues concerning reunification, and because the order lacked written findings to show that the court considered these issues, the guardianship order must be vacated." We disagree.
The trial court entered its cease reunification order and made adoption Lydia's permanent plan in July 2015, prior to the effective date of the concurrent planning statute. In the cease reunification order, the court complied with N.C. Gen. Stat. § 7B-507(b)(1) (2013) when it found "that reunification efforts would be futile or inconsistent with [Lydia's] health, safety and need for a safe, permanent home within a reasonable time."
Mrs. A fails to cite any legal authority which mandates that a trial court reinstate reunification as part of the permanent plan after a parent has been allowed to set aside a voluntary relinquishment of her parental rights. However, even assuming arguendo that the setting aside of Mrs. A's relinquishment required the court to again consider the possibility of reunification, the court's concurrent planning and guardianship orders satisfied that requirement and demonstrate that the court did not "abandon[ ] any concern with reunification" as Mrs. A contends.
The concurrent planning order of August 2016 maintained adoption as the primary plan for Lydia and added guardianship as a secondary plan. The trial court noted in the order that "reunification efforts with [Mrs. A] were previously ceased" and included findings related to Lydia's placement with Mr. and Mrs. S and visits with Mrs. A. The court then specifically found that "[t]he return of the child to [Mrs. A's] home would be contrary to the child's health and safety" and concluded that "[a] plan of reunification is not in the best interests of the child," who by that time had been living with Mr. and Mrs. S for nearly two years.
Finally, prior to entering its guardianship order of August 2017, the trial court considered whether reunification efforts would have been fruitful or if placement in Mrs. A's home in the next six months was in Lydia's best interest. The court received extensive testimony from the therapist, Mrs. A, the social worker, Mr. and Mrs. S, and the GAL, and its order includes more than forty findings of fact-many of which remain unchallenged on appeal-that all demonstrate the court's exhaustive examination of this key issue. As to Mrs. A's claim that the therapist was advocating for a transition to Mrs. A's home "within the next three months," the record shows that the therapist testified as follows:
Q: If the Court is [ ] inclined to make reunification[ ] the primary plan for the child ... what is your suggestion on a transition plan ... from [Mr. and Mrs. S's house] to [Mrs. A's] house?
A: Timeframe?
Q: Uh hum.
A: I think if that was the Court's ruling ... given that this has gone on for so long and this has been traumatizing for [Lydia] and really everyone involved, in my opinion the best thing would be to do it, to limit it maybe three months, no more.
This testimony, given at the 17 November 2016 hearing and in response to a hypothetical scenario presented by Mrs. A's attorney, cannot be said to constitute a recommendation that Lydia be returned to Mrs. A's home within three months. Moreover, the therapist went on to testify that this was the first case in which she had worked with a department of social services, and the social worker testified at the 9 February 2017 hearing that the therapist "has reported that she does not want to make any recommendations about placement."
In sum, the trial court ceased reunification efforts and made adoption the primary plan for Lydia in July 2015, and it added a secondary plan of guardianship in August 2016. Thus, when the court implemented the plan of guardianship and waived further review hearings in August 2017, reunification had not been part of Lydia's permanent plan for more than two years. Nevertheless, to the extent that findings related to reunification were required after those efforts had been ceased, we conclude that the court made sufficient findings in its concurrent planning and guardianship orders to satisfy the statutory mandates. See In re L.M.T. , 367 N.C. 165, 167-68, 752 S.E.2d 453, 455 (2013) (holding that order ceasing reunification should be considered together with termination of parental rights order; either order standing alone, or the orders as read together, can be enough to satisfy the statutory mandate).
V. Constitutionally-Protected Parental Status
In its guardianship order, the trial court found that "[t]he parents have acted inconsistently with their Constitutionally-protected parental status" and that "[b]oth parents are acting in a manner inconsistent with the health and safety of the child." Mrs. A specifically challenges the evidentiary support for these two findings. According to Mrs. A, "[b]ecause these findings are unsupported by the evidence, the court erred in setting aside [Mrs. A's] superior right [to custody] and instead permanently placing Lydia with a non-parent."
A trial court must address a parent's constitutionally-protected status before awarding guardianship to a non-parent. In re P.A. , 241 N.C. App. 53, 66-67, 772 S.E.2d 240, 249 (2015). However, in order to raise a constitutional issue challenging the trial court's finding that she has acted inconsistently with her protected parental status, a parent must have preserved the issue by objecting to the finding in the trial court. In re T.P. , 217 N.C. App. 181, 186, 718 S.E.2d 716, 719 (2011).
Here, Mrs. A waived appellate review of the two findings by failing to object in the trial court. Mrs. A acknowledges this failure but nevertheless asserts that "the issue of whether a trial court has utilized the correct legal standard does not require the parent to lodge an objection to the legal standard, or to make the court aware of the correct legal standard." However, this attempt to bypass our preservation requirements fails because Mrs. A challenges the two findings as unsupported by the evidence, and she raises the applicable legal standard as an entirely separate issue, as discussed below.
Because she failed to properly preserve this issue for appellate review, we decline to address the merits of Mrs. A's challenge to the evidentiary support for these two findings.
VI. Best Interest Determination
A. Applicable legal standard
As to the trial court's determination that guardianship was in Lydia's best interests, Mrs. A first contends the court applied the wrong legal standard in making its determination. Mrs. A cites to Santosky v. Kramer , 455 U.S. 745, 747-48, 102 S.Ct. 1388, 1391-92 (1982), for the proposition that the court's findings should have been entered under a "clear and convincing evidence" standard rather than the "best interests" standard.
Mrs. A acknowledges that prior to announcing its ruling, the trial court stated that the evidence must be "clear, cogent, [and] convincing." However, according to Mrs. A, the court "revealed that it had conflated the 'clear and convincing' standard with the lesser 'best interests' standard" when it announced its ruling. Mrs. A bases her contention solely on the following excerpt from the transcript:
THE COURT: When I asked [the attorney advocate], tell me the standard, I know what the standard is, it's the best interest of this child. I'm not doing this for [Mr. and Mrs. S]. I'm not rewarding them. I'm not doing this against [Mrs. A]. I'm not punishing her. That's not want [sic] a Court does. Not what a Court should do. I'm doing this for this child because it's in her best interest. That's the only reason why I believe that. It's her best interest.
Other than this attempt by the trial court to explain its determination in a way that the parties might be able to understand, there is no indication that the court applied the wrong legal standard in making its best interest determination.
"Error will not be presumed on appeal; it must be affirmatively established." Mason v. Town of Andrews , 193 N.C. 854, 854, 138 S.E. 341, 342 (1927). Because Mrs. A has failed to establish that the trial court applied the wrong legal standard in making its determination, her assignment of error is overruled.
B. Challenged findings of fact
Mrs. A also contends "the court's determination of what was in Lydia's best interests was supported by a series of findings not based in the evidence. Therefore, the court erred in concluding that guardianship was in Lydia's best interests." Mrs. A specifically challenges findings of fact nos. 11, 13, 26, 27, and 31. She concludes that "[b]ecause the findings of fact present an incorrectly negative view of [Mrs. A] and her home, the court's conclusion as to best interests is not fully supported by the evidence and findings, and it must be set aside." We disagree.
Findings nos. 11 and 13 describe Lydia's visitation with Mrs. A and are included amongst related findings as follows:
9..... Under the monitored visitation schedule, the mother and child visits occur on a weekly basis; every other week, the visits include the child's three siblings.
10. [Lydia] goes happily to visits that include her siblings. [Lydia] has a strong bond with her siblings, but an especially strong bond with her brother, [Jeb]. [Lydia] often cries or she and [Jeb] hide when the visits with [Jeb] end.
11. [Lydia] is apprehensive about visits only with [Mrs. A]. At times, she has cried about not wanting to go to these visits, and has had to be carried into the visit. However, once the visits with [Mrs. A] begin, she enjoys the visits.
12. Once the monitored visitation schedule was established and [Mr. and Mrs. S] and their children were no longer included in the visits, [Lydia] began asking more questions about where she will live and who is her family.
13. Visits with only [Mrs. A] have resulted in anxiety and defiant behavior from the child.
14. [Lydia] has made statements after visits, such as, directed to [Mrs. S], "Are you my real mom? [Mrs. A] says you're not my real mom; that she's my real mom." The week prior to this hearing, after a sibling visit, [Lydia] stated that, "on Monday a judge will decide if I'm going to live with you or [Mrs. A]." [Mr. and Mrs. S] have never mentioned court dates or proceedings to [Lydia] or their children. [Mrs. A] denies discussing court with the child, but believes the oldest sibling, who was also subject to the juvenile petition and is now over the age of 18, mentions court to [Lydia] during sibling visits.
15. [Lydia] has made recent statements about wanting to live with [Mrs. A]. It is unknown whether the child appreciates that this would mean leaving [Mr. and Mr. S] permanently.
16. At visits with [Mrs. A], and visits with siblings, [Mrs. A] provides food, snacks, activities, and crafts for the visit. [Lydia] receives a new toy, new clothes, or candy at the majority of visits.
These findings are supported by the extensive testimony presented at the review hearings. For example, the social worker described Lydia's behavior immediately before her visits with Mrs. A, which included crying, saying that she did not want to go to the visits, and clinging to Mr. and Mrs. S, all of which support the court's finding that Lydia was "apprehensive about visits only with [Mrs. A, rather than visits that included her siblings]." Similarly, Mrs. S testified to Lydia's increased anxiety following her visits with Mrs. A, which included difficult and defiant behavior, confusion about her status within Mr. and Mrs. S's home, and sleep disturbances.
Finding no. 26 states that although Mrs. A completed parenting classes, she failed to demonstrate age-appropriate parenting skills. The finding details the social worker's need to redirect Mrs. A's comments as well as Mrs. A's inability to redirect the other children's inappropriate comments to Lydia about Mr. and Mrs. S and the role of the court, all of which is based directly on the social worker's testimony.
Finding no. 27 indicates that the trial court had ongoing concerns regarding Mrs. A's mental health. As Mrs. A's therapist testified, Mrs. A had presented symptoms of obsessive compulsive disorder, major depressive disorder with anxious distress, post-traumatic stress disorder, and adjustment disorder with mixed disturbance of emotions and conduct. The therapist testified that although Mrs. A had made progress, she had been through "a lot of trauma" and "had a long road ahead." Mrs. A herself testified that she was currently seeing two therapists and was prescribed Cymbalta, Celexa, and Klonopin for extreme anxiety. This testimony supports the court's finding as to its ongoing concerns about Mrs. A's mental health.
Finally, finding no. 31 states that "[t]he return of the child to her home would be contrary to the child's health and safety." In challenging this finding, Mrs. A contends merely that "all that was known about [her home] was positive." This argument ignores the evidence, as memorialized in finding no. 25, that
[Lydia] suffered trauma when she was placed in an orphanage in Ukraine; she again suffered trauma when she was expelled from her adoptive home into the home of then-strangers in a culture she did not recognize or understand. To remove [Lydia] from [Mr. and Mrs. S's] home would be to inflict an additional and unnecessary trauma to the child.
This unchallenged finding is supported by the evidence and specifically explains why Lydia's return to Mrs. A's home would be contrary to her health and safety, despite the fact that the home itself may be objectively safe.
VII. Conclusion
The trial court made detailed findings of fact to support its conclusion that guardianship with Mr. and Mrs. S was in Lydia's best interest. Those findings are in turn supported by clear, cogent, and convincing evidence. Accordingly, the order of the trial court is hereby:
AFFIRMED.
Report per Rule 30(e).
Judges HUNTER, JR. and ZACHARY concur.

Pseudonyms are used throughout this opinion to protect the identities of the juveniles and for ease of reading.

Mr. A is not a party to this appeal.

Having reached the age of majority in July 2016, Virginia is no longer subject to the jurisdiction of the juvenile court.